IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Judge Edward W. Nottingham**

Civil Action No. 04–cv–02053–EWN–MJW

MICHAEL MURPHY,

      Plaintiff,

v.

TXI OPERATIONS, LP,

      Defendant.

---

## ORDER AND MEMORANDUM OF DECISION

---

      This is a section 1981 case.  Plaintiff Michael Murphy alleges that Defendant TXI

Operations, LP, his former employer, discriminated and retaliated against him based on his race in

violation of 42 U.S.C. § 1981 ("section 1981") (2006) and engaged in various state law

violations.  This matter is before the court on "Defendant TXI Operations, LP's Motion for

Summary Judgment," filed June 6, 2005.  Jurisdiction is premised upon federal question and

supplemental jurisdiction, 28 U.S.C. §§ 1331, 1367 (2006), respectively.

**FACTS**

*1.      Factual Background*

Plaintiff, an African-American, worked for Defendant from approximately March 12, 2001 through October 2, 2002.  (Def. TXI Operations, LP's Mot. for Summ. J., Def. TXI Operations, LP's Mem. in Supp. of its Mot. for Summ. J., Statement of Undisputed Material Facts ¶ 5 [filed June 6, 2005] [hereinafter "Def.'s Br."]; *admitted at* Pl.'s Resp. to Def's Mot. for Summ. J., Resp. to Def.'s Statement of Undisputed Material Facts ¶ 5 [filed Aug. 2, 2005] [hereinafter "Pl.'s Resp."].)  Defendant, a wholly owned subsidiary of TXI, Inc., operates a mining facility in Boulder, Colorado that engages in the extraction and manufacture of expanded shale.  (*Id.*, Statement of Undisputed Material Facts ¶ 1; *admitted at* Pl.'s Resp., Resp. to Def.'s Statement of Undisputed Material Facts ¶ 1.)  Prior to the end of his employment, Plaintiff worked as an equipment operator in Defendant's production department.  (*Id.*, Statement of Undisputed Material Facts ¶ 6; *admitted at* Pl.'s Resp., Resp. to Def.'s Statement of Undisputed Material Facts ¶ 6.)  Plaintiff was one of two African-Americans who worked for Defendant.  (Pl.'s Resp., Statement of Additional Disputed Facts ¶ 1; *admitted at* Def. TXI Operations, LP's Reply Br. in Supp. of its Mot. for Summ. J., Resp. Concerning Pl.'s Statement of Additional Disputed Facts ¶ 1 [filed Aug. 17, 2005] [hereinafter "Def.'s Reply"].)

Larry Giorno, Defendant's pyro process supervisor, interviewed, hired, and initially trained Plaintiff.  (Def.'s Br., Statement of Undisputed Material Facts ¶ 8; *admitted at* Pl.'s Resp., Resp. to Def.'s Statement of Undisputed Material Facts ¶ 8.)  Plaintiff generally reported to kiln

managing employees, or "leads," Randy Blumenshine, Chris Wilkins, and Ray Pearce in order to receive work assignments. (*Id.*, Statement of Undisputed Material Facts ¶ 9; *admitted at* Pl.'s Resp., Resp. to Def.'s Statement of Undisputed Material Facts ¶ 9.) During Plaintiff's employment, the kiln leads all reported to Giorno, who in turn reported to plant manager Gary Feiner. (*Id.*, Statement of Undisputed Material Facts ¶ 10; *admitted at* Pl.'s Resp., Resp. to Def.'s Statement of Undisputed Material Facts ¶ 10.)

Defendant's written policies and employee handbook prohibited racial discrimination, harassment, and retaliation for reporting such behavior. (*Id.*, Statement of Undisputed Material Facts ¶¶ 13, 14; *admitted at* Pl.'s Resp., Resp. to Def.'s Statement of Undisputed Material Facts ¶¶ 13, 14.) On February 26, 2002, Plaintiff signed Defendant's "Anti-Discrimination and Anti-Harassment Position," indicating he "underst[ood], agree[d,] and acknowledge[d]" that:

> [Defendant] is committed to provide a work environment and all aspects of employment free of harassment, intimidation, coercion, and discriminating behavior and conditions. . . . It is important that [Defendant] be informed immediately if an employee experiences or observes anything believed to be discrimination or harassment. <u>Nothing can be done to remedy the problem if [Defendant] does not know it exists</u>. . . . Any employee who believes s/he is the victim of harassment or discrimination or who witnesses what s/he believes to be harassment or discrimination is encouraged to speak to the offending individual about his or her offensive conduct . . . . If an employee is uncomfortable approaching the offender . . . s/he should report such facts to his/her supervisor. Employees who are uncomfortable approaching their supervisor for any reason or feel that the matter is not being adequately addressed should bring the matter to the attention of the next level of management, [h]uman [r]esources, or a [c]orporate [o]fficer. . . . no employee will be retaliated against for reporting such behavior or participating in an investigation.

-3-

(*Id.*, Statement of Undisputed Material Facts ¶ 17; *deemed admitted at* Pl.'s Resp., Resp. to

Def.'s Statement of Undisputed Material Facts ¶ 17.)[1]

### a.   *Michael Gibrael's Comments*

Michael Gibrael worked for Defendant as a quarry lead.  (*Id.*, Statement of Undisputed

Material Facts ¶ 25; *admitted at* Pl.'s Resp., Resp. to Def.'s Statement of Undisputed Material

Facts ¶ 25.)  Gibrael never supervised Plaintiff.  (*Id.*)  Plaintiff testified he believed Gibrael used

the term "wetback" between seven and ten times to describe one of Plaintiff's co-workers who

was Mexican-American.  (*Id.*, Statement of Undisputed Material Facts ¶ 107; *admitted at* Pl.'s

Resp., Resp. to Def.'s Statement of Undisputed Material Facts ¶ 107.)  Plaintiff told his Mexican-

American co-worker about Gibrael's comments, but did not report them to any other of

Defendant's employees.  (*Id.*, Statement of Undisputed Material Facts ¶ 108; *admitted at* Pl.'s

Resp., Resp. to Def.'s Statement of Undisputed Material Facts ¶ 108.)

In April 2002, while Plaintiff was eating lunch, Gibrael entered the break room and

complained that Defendant was unwilling to spend money, stating "[t]hey're so damn cheap they

don't want to spend no money on nothing [sic].  Got me nigger rigging everything."  (*Id.*,

Statement of Undisputed Material Facts ¶ 26; *admitted at* Pl.'s Resp., Resp. to Def.'s Statement

of Undisputed Material Facts ¶ 26.)  Several other employees were present in the break room

when Gibrael made the comment, including lead mechanic Bill Wall.  (*Id.*, Statement of

---

[1]Plaintiff admits he signed the document, but denies he understood its contents.  (Pl.'s
Resp., Resp. to Def.'s Statement of Undisputed Material Facts ¶ 17.)  Accordingly, I deem
Defendant's statement admitted.

Undisputed Material Facts ¶ 27; *admitted at* Pl.'s Resp., Resp. to Def.'s Statement of Undisputed

Material Facts ¶ 27.)  Within minutes of Gibrael's comment, Plaintiff left the break room and told

Giorno that he did not "think [he] should have to listen to that kind of stuff."  (*Id.*, Statement of

Undisputed Material Facts ¶ 28; *admitted at* Pl.'s Resp., Resp. to Def.'s Statement of Undisputed

Material Facts ¶ 28.)  Giorno subsequently spoke with Gibrael about Plaintiff's concerns and

urged Gibrael to apologize to Plaintiff.  (*Id.*, Statement of Undisputed Material Facts ¶ 30;

*admitted at* Pl.'s Resp., Resp. to Def.'s Statement of Undisputed Material Facts ¶ 30.)

Approximately fifteen to twenty minutes after Plaintiff expressed his concerns to Giorno, Gibrael

apologized to Plaintiff.  (*Id.*, Statement of Undisputed Material Facts ¶ 31; *admitted at* Pl.'s

Resp., Resp. to Def.'s Statement of Undisputed Material Facts ¶ 31.)  During the course of his

apology, Gibrael told Plaintiff that he (Gibrael) had been called a "sand nigger."  (*Id.*, Statement

of Undisputed Material Facts ¶ 32; *admitted at* Pl.'s Resp., Resp. to Def.'s Statement of

Undisputed Material Facts ¶ 32.)  Plaintiff did not report Gibrael's "sand nigger" comment to

Giorno or any other manager.  (*Id.*)  After Gibrael apologized, Plaintiff considered the matter

between them resolved.  (*Id.*, Statement of Undisputed Material Facts ¶ 33; *admitted at* Pl.'s

Resp., Resp. to Def.'s Statement of Undisputed Material Facts ¶ 33.)  Plaintiff testified that he

never heard Gibrael use the term "wetback" after Gibrael's apology for his April 2002 "nigger

rig" comment.  (*Id.*, Statement of Undisputed Material Facts ¶ 110; *admitted at* Pl.'s Resp., Resp.

to Def.'s Statement of Undisputed Material Facts ¶ 110.)

Giorno reported Gibrael's "nigger-rig" comment to Feiner and to Gibrael's supervisor, Randy Moulton.  (*Id.*, Statement of Undisputed Material Facts ¶ 36; *admitted at* Pl.'s Resp., Resp. to Def.'s Statement of Undisputed Material Facts ¶ 36.)  Moulton gave Gibrael a verbal warning prohibiting the use of "any kind of [r]acial [s]lurs in or around the plant site," and indicating that "any further incidents will result in further disciplinary action."  (*Id.*, Statement of Undisputed Material Facts ¶ 37; *admitted at* Pl.'s Resp., Resp. to Def.'s Statement of Undisputed Material Facts ¶ 37.)  Feiner witnessed the verbal warning, which was also memorialized in writing.  (*Id.*)

> **b.   Al Ramirez's Comments**

Al Ramirez worked as a kiln lead for Defendant.  (*Id.*, Statement of Undisputed Material Facts ¶ 91; *admitted at* Pl.'s Resp., Resp. to Def.'s Statement of Undisputed Material Facts ¶ 91.)  At one point in 2001, while Plaintiff, Ramirez, and lead employee Wilkins were in the break room together, Ramirez recounted a story to Plaintiff about a woman being considered for jury selection who commented "if it's a nigger, he already [sic] guilty."  (*Id.*, Statement of Undisputed Material Facts ¶ 92; *admitted at* Pl.'s Resp., Resp. to Def.'s Statement of Undisputed Material Facts ¶ 92.)  Plaintiff did not report Ramirez's statement to any of Defendant's management employees.  (*Id.*, Statement of Undisputed Material Facts ¶ 93; *admitted at* Pl.'s Resp., Resp. to Def.'s Statement of Undisputed Material Facts ¶ 93.)

In July 2001, Ramirez told Plaintiff that while growing up in California, "the niggers used to chase [Ramirez] all the time."  (*Id.*, Statement of Undisputed Material Facts ¶ 94; *admitted at*

Pl.'s Resp., Resp. to Def.'s Statement of Undisputed Material Facts ¶ 94.)  Plaintiff told Ramirez

he was offended by the use of the epithet "nigger" and asked Ramirez not to use it again.  (*Id.*,

Statement of Undisputed Material Facts ¶ 95; *admitted at* Pl.'s Resp., Resp. to Def.'s Statement

of Undisputed Material Facts ¶ 95, Ex. 2 at 87–88 [Murphy Dep.].)

In Winter 2001, Ramirez commented that an African-American acquaintance of his would

avenge him for the acts of one of Defendant's former employees.  (*Id.*, Statement of Undisputed

Material Facts ¶ 96; *admitted at* Pl.'s Resp., Resp. to Def.'s Statement of Undisputed Material

Facts ¶ 96.)  In Plaintiff's presence, Ramirez referred to his acquaintance, asking "[w]here that

nigger at [sic]?"  (*Id.*)  Plaintiff did not complain to Ramirez or any other of Defendant's

employees about the comment.  (*Id.*, Statement of Undisputed Material Facts ¶ 97; *admitted at*

Pl.'s Resp., Resp. to Def.'s Statement of Undisputed Material Facts ¶ 97.)

> c.     ***Randy Blumenshine's Comments***

Blumenshine worked for Defendant as a kiln lead.  (*Id.*, Statement of Undisputed Material

Facts ¶ 98; *admitted at* Pl.'s Resp., Resp. to Def.'s Statement of Undisputed Material Facts ¶ 98.)

Plaintiff reported to Blumenshine during part of his employment.  (*Id.*)  On an unspecified date,

Blumenshine told Plaintiff that the Grand Tetons were "God's country, because there wasn't no

[sic] blacks and there wasn't no [sic] Mexicans up there."  (*Id.*, Statement of Undisputed Material

Facts ¶ 99; *admitted at* Pl.'s Resp., Resp. to Def.'s Statement of Undisputed Material Facts ¶ 99.)

Plaintiff responded by telling Blumenshine that he was "being racist."  (*Id.*, Statement of

Undisputed Material Facts ¶ 100; *admitted at* Pl.'s Resp., Resp. to Def.'s Statement of

Undisputed Material Facts ¶ 100.)  Plaintiff testified that although Blumenshine never made derogatory comments about African-Americans again, Blumenshine subsequently stated he "didn't like Mexicans."  (*Id.*, Ex. 2 at 94, 126–27 [Murphy Dep.].)

### d.     Jim Carter's Comments

Carter worked for Defendant as an equipment operator.  (*Id.*, Statement of Undisputed Material Facts ¶ 111; *admitted at* Pl.'s Resp., Resp. to Def.'s Statement of Undisputed Material Facts ¶ 111.)  Sometime in 2002, police stopped Carter on his way to work.  (*Id.*, Statement of Undisputed Material Facts ¶ 112; *admitted at* Pl.'s Resp., Resp. to Def.'s Statement of Undisputed Material Facts ¶ 112.)  Later that day, in the presence of Plaintiff and Pearce, Carter commented that when the police "stop them, it's profiling, but it's [alright] to stop [Carter]." (*Id.*)  Plaintiff testified that Carter pointed at him when he said "them," indicating African-Americans with his gesture.  (*Id.*)  Additionally, Carter once recounted to Plaintiff that Carter's father called his workers "niggers."  (Pl.'s Resp., Statement of Additional Disputed Facts ¶ 29, Ex. 4 at 21–22 [Carter Dep.].)  Plaintiff did not complain about Carter's comments to any of Defendant's employees.  (Def.'s Br., Statement of Undisputed Material Facts ¶ 113; *admitted at* Pl.'s Resp., Resp. to Def.'s Statement of Undisputed Material Facts ¶ 113.)

### e.     Josh Jiminez's Comments

Josh Jimenez worked for Defendant as an equipment operator.  (*Id.*, Statement of Undisputed Material Facts ¶ 114; *admitted at* Pl.'s Resp., Resp. to Def.'s Statement of Undisputed Material Facts ¶ 114.)  During a conversation in September 2002, Jimenez asked

Plaintiff whether he was from Arkansas.  (*Id.*, Statement of Undisputed Material Facts ¶ 115; *admitted at* Pl.'s Resp., Resp. to Def.'s Statement of Undisputed Material Facts ¶ 115.)  Upon receiving Plaintiff's affirmative response,  Jimenez asked "don't they hang you in Arkansas for fooling with white women?"  (*Id.*)  Plaintiff testified that he was not offended by Jimenez's comment.  (*Id.*, Ex 2 at 219–20 [Murphy Dep.].)

    *f.     The September 2002 Noose Incident*

     Defendant asserts that during the second quarter of 2002, quarter-to-quarter losses in Defendant's retirement plan and stock portfolio experienced considerable devaluation.  (*Id.*, Statement of Undisputed Material Facts ¶ 40, Ex. 6 at 136–38 [Feiner Dep.], Ex. 21 at Ex. A [Shamon Aff.].)  Plaintiff neither admits nor denies Defendant's assertion.  (Pl.'s Resp., Resp. to Def.'s Statement of Undisputed Material Facts ¶ 40.)  On September 27, 2002, Defendant's maintenance employees Vince Breazeale, Troy Heaton, Chris Pond, and Bill Wall discussed the poor rate of return on Defendant's retirement plan in the maintenance shop area.  (Def.'s Br., Statement of Undisputed Material Facts ¶ 43; *admitted at* Pl.'s Resp., Resp. to Def.'s Statement of Undisputed Material Facts ¶ 43.)   Brezeale, Heaton, Pond, and Wall hung a rope with a noose in the maintenance shop, drew a chalk outline of a body beneath the noose, and placed a sign on the noose stating "[Defedant] Retirement Plan." (*Id.*, Statement of Undisputed Material Facts ¶ 44; *admitted at* Pl.'s Resp., Resp. to Def.'s Statement of Undisputed Material Facts ¶ 44.)  The parties hotly contest the motivation behind these actions.  Defendant asserts that Breazeale, Heaton, Pond, and Wall took these actions in protest of the poor returns on Defendant's

retirement plan. (*Id.*, Ex. 22 ¶¶ 7–10 [Pond Aff.], Ex. 23 ¶¶ 8–13 [Wall Aff.], Ex. 24 ¶¶ 6–10

[Heaton Aff.].)  Plaintiff contends that these actions were a purposeful expression of racial hatred

directed towards him.  (Pl.'s Resp., Resp. to Def.'s Statement of Undisputed Material Facts ¶ 45,

Ex. 2 at 156–57 [Murphy Dep.].)

On September 29, 2002 at approximately 8:00 or 9:00 o'clock p.m., Plaintiff saw the

rope, noose and chalk outline.  (Def.'s Br., Statement of Undisputed Material Facts ¶ 50;

*admitted at* Pl.'s Resp., Resp. to Def.'s Statement of Undisputed Material Facts ¶ 50.)  Plaintiff

asserts he thought of Jimenez's comment when he saw the noose.  (*Id.*, Ex. 2 at 219–20 [Murphy

Dep.].)  Plaintiff left the maintenance area, positioned himself beneath a desk, and telephoned his

wife, who requested that he come home.  (*Id.*, Statement of Undisputed Material Facts ¶ 56;

*admitted at* Pl.'s Resp., Resp. to Def.'s Statement of Undisputed Material Facts ¶ 56.)  Plaintiff

asserts that after talking to his wife, he attempted to perform his work duties, but was too upset

to do so.  (*Id.*, Statement of Undisputed Material Facts ¶ 57; *admitted at* Pl.'s Resp., Resp. to

Def.'s Statement of Undisputed Material Facts ¶ 57.)  Plaintiff located Pearce, told him about the

noose, and went with him to the maintenance shop.  (*Id.*, Statement of Undisputed Material Facts

¶ 59; *admitted at* Pl.'s Resp., Resp. to Def.'s Statement of Undisputed Material Facts ¶ 59.)

Pearce assured Plaintiff he would tell Feiner about the noose and allowed Plaintiff to leave work

at approximately midnight, several hours before Plaintiff's shift was scheduled to end.  (*Id.*,

Statement of Undisputed Material Facts ¶¶ 60, 61; *admitted at* Pl.'s Resp., Resp. to Def.'s

Statement of Undisputed Material Facts ¶¶ 60, 61.)

On September 30, 2002, Pearce told Giorno about the noose incident.  (*Id.*, Statement of Undisputed Material Facts ¶ 62; *admitted at* Pl.'s Resp., Resp. to Def.'s Statement of Undisputed Material Facts ¶ 62.)  Giorno reported the information to Feiner.  (*Id.*)  Feiner requested the rope and asked Giorno to schedule an interview with Plaintiff.  (*Id.*, Statement of Undisputed Material Facts ¶¶ 62, 63; *admitted at* Pl.'s Resp., Resp. to Def.'s Statement of Undisputed Material Facts ¶¶ 62, 63.)  The same day, Feiner: (1) interviewed maintenance department employees, who named the individuals involved in the incident and explained that the incident was a "prank over the 401(k) plan;"and (2) met with Plaintiff, Giorno ,and Wilkins about the incident.  (*Id.*, Statement of Undisputed Material Facts ¶¶ 64, 65; *admitted at* Pl.'s Resp., Resp. to Def.'s Statement of Undisputed Material Facts ¶¶ 64, 65.)

Defendant asserts that on October 2, 2002, Feiner met with all the members of the maintenance crew about the incident and instructed them that their behavior was not acceptable.  (*Id.*, Ex. 6 at 124–25, 128, 159 [Feiner Dep.].)  Plaintiff neither admits nor denies Defendant's assertion.  (Pl.'s Resp., Resp. to Def.'s Statement of Undisputed Material Facts ¶ 70.)  After speaking with Plaintiff and the maintenance crew, Feiner concluded that the creation of the rope, noose, and chalk drawing was not racially motivated.  (Def.'s Br., Statement of Undisputed Material Facts ¶ 72; *admitted at* Pl.'s Resp., Resp. to Def.'s Statement of Undisputed Material Facts ¶ 72.)

On October 4, 2002, Plaintiff returned to work.  (*Id.*, Statement of Undisputed Material Facts ¶ 73; *admitted at* Pl.'s Resp., Resp. to Def.'s Statement of Undisputed Material Facts ¶ 73.)

-11-

Upon Plaintiff's return, the maintenance crew apologized to Plaintiff and stated the display was a joke about Defendant's retirement plan.  (*Id.*, Statement of Undisputed Material Facts ¶ 74; *admitted at* Pl.'s Resp., Resp. to Def.'s Statement of Undisputed Material Facts ¶ 74.)  On October 4, 2002 and October 5, 2002, Plaintiff worked full shifts.  (*Id.*, Statement of Undisputed Material Facts ¶¶ 73, 75; *admitted at* Pl.'s Resp., Resp. to Def.'s Statement of Undisputed Material Facts ¶ 73, 75.)  Plaintiff asserts that he believed a group of employees stared at him on October 5, 2002.  (*Id.*, Statement of Undisputed Material Facts ¶ 76; *admitted at* Pl.'s Resp., Resp. to Def.'s Statement of Undisputed Material Facts ¶ 76.)  Plaintiff did not report the incident to any of Defendant's employees.  (*Id.*, Statement of Undisputed Material Facts ¶ 79; *admitted at* Pl.'s Resp., Resp. to Def.'s Statement of Undisputed Material Facts ¶ 79.)

On October 6, 2002, Plaintiff returned to work.  (*Id.*, Statement of Undisputed Material Facts ¶ 80; *admitted at* Pl.'s Resp., Resp. to Def.'s Statement of Undisputed Material Facts ¶ 80.)  On October 6, 2002, while completing time cards, Pearce asked Plaintiff about how to account for the time Plaintiff took off on September 29, 2002 and September 30, 2002.  (*Id.*)  Plaintiff told Pearce that Feiner had given him approval to take paid time off for those dates.  (*Id.*)  Pearce responded that he (Pearce) should have pretended to believe the noose was intended for himself so that he could "get paid for nothing."  (*Id.*, Statement of Undisputed Material Facts ¶ 84; *admitted at* Pl.'s Resp., Resp. to Def.'s Statement of Undisputed Material Facts ¶ 84.)  Carter overheard the exchange between Pearce and Plaintiff, became upset, and left the room.  (*Id.*,

Statement of Undisputed Material Facts ¶ 83; *admitted at* Pl.'s Resp., Resp. to Def.'s Statement of Undisputed Material Facts ¶ 83.)

### g.   *Termination of Plaintiff's Employment*

Later on October 6, 2002, Plaintiff needed Carter's help, and sought to locate him.  (*Id.*, Statement of Undisputed Material Facts ¶ 85; *admitted at* Pl.'s Resp., Resp. to Def.'s Statement of Undisputed Material Facts ¶ 85.)  When Plaintiff found Carter, Carter bumped into Plaintiff and walked past him without speaking.  (*Id.*)  At this point, Plaintiff decided to terminate his employment with Defendant.  (*Id.*, Statement of Undisputed Material Facts ¶ 86; *admitted at* Pl.'s Resp., Resp. to Def.'s Statement of Undisputed Material Facts ¶ 86.)  Plaintiff testified:

> this whole thing is a joke to you guys. . . . [Y]ou say I'm faking so I can get paid for nothing.  [Pearce] don't [sic] answer me.  I say, [']I can't handle this no more,[sic] man.[']  I say [']I can't handle it no more [sic].[']  I took my radio off and I handed to [Pearce], and I got in my car and I left.

(Pl.'s Resp., Ex. 2 at 209–10 [Murphy Dep.].)  On October 8, 2002, Plaintiff returned to Defendant's plant to empty his locker and collect his final paycheck.  (*Id.*, Statement of Undisputed Material Facts ¶ 88; *admitted at* Pl.'s Resp., Resp. to Def.'s Statement of Undisputed Material Facts ¶ 88.)  Plaintiff spoke with Giorno and Wilkins, and told them he was returning home to Arkansas, but gave no explanation as to why.  (*Id.*, Statement of Undisputed Material Facts ¶ 89; *admitted at* Pl.'s Resp., Resp. to Def.'s Statement of Undisputed Material Facts ¶ 89.) Defendant replaced Plaintiff with an employee who was not African-American.  (Pl.'s Resp., Statement of Additional Disputed Facts ¶ 75; *admitted at* Def.'s Reply, Resp. Concerning Statement of Additional Disputed Facts ¶ 75.)

## 2.   *Procedural History*

On October 4, 2004, Plaintiff filed a complaint against Texas Industries, Inc. in this court.

(Compl. [filed Oct. 4, 2004].)  On November 17, 2004, Plaintiff contemporaneously filed an

unopposed motion to dismiss Texas Industries and an amended complaint as against Defendant.

(First Am. Compl. [filed Nov. 17, 2004] [hereinafter "Am. Compl."]; Pl.'s Unopposed Mot. for

Dismissal of Def. Texas Industries, Inc., Without Prejudice [filed Nov. 17, 2004].)  Plaintiff

asserts four claims for relief: (1) discrimination under section 1981; (2) retaliation under section

1981; (3) breach of the covenant of good faith and fair dealing; and (4) intentional infliction of

emotional distress/outrageous conduct.  (Am. Compl.)  On December 1, 2004, Defendant filed an

answer.  (Answer of Def. TXI Operations, LP to Pl.'s First Am. Compl. [filed Dec. 1, 2004].)

On May 27, 2005, the Equal Employment Opportunity Commission ("EEOC")

contemporaneously filed a complaint against Defendant and a motion to consolidate with the

instant case.  (Compl. and Jury Demand [filed May 27, 2005]; Motion to Consolidate [filed May

27, 2005].)  On June 30, 2005, Defendant filed a response to the EEOC's motion.  (Def. TXI's

Opp'n to Pl. EEOC's Mot. to Consolidate [filed June 30, 2005].)  On July 25, 2005, Plaintiff and

the EEOC filed a joint reply in support of the motion to consolidate.  (Pls.' Joint Reply in Supp.

of Mot. to Consolidate [filed July 25, 2005].)  On July 28, 2005, I denied the EEOC's motion.

(Order Denying Mot. to Consolidate [filed July 28, 2005].)

On June 6, 2005, Defendant filed a motion for summary judgment.  (Def.'s Br.)

Defendant argues Plaintiff cannot maintain his claims because: (1) no hostile work environment

-14-

existed, or if it did, Defendant is not liable therefor; (2) Plaintiff cannot establish a *prima facie*

case for discrimination or retaliation; (3) Colorado law does not contemplate a cause of action for

breach of an express covenant of good faith and fair dealing, and to the extent it does, Plaintiff

cannot prove such a claim; and (4) Plaintiff cannot prove outrageous conduct and the Colorado

Workers' Compensation Act is his exclusive remedy.  (Def.'s Br. at 24.)  On August 2, 2005,

Plaintiff filed a response to Defendant's motion.  (Pl.'s Resp.)  On August 17, 2005, Defendant

filed a reply in support of its motion.  (Def.'s Reply.)  This matter is fully briefed.

## ANALYSIS

*1.      Standard of Review*

Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, the court may grant

summary judgment where "the pleadings, depositions, answers to interrogatories, and admissions

on file, together with the affidavits, if any, show that there is no genuine issue as to any material

fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c)

(2006); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–50 (1986); *Concrete Works, Inc.*

*v. City & County of Denver*, 36 F.3d 1513, 1517 (10th Cir. 1994).  The moving party bears the

initial burden of showing an absence of evidence to support the nonmoving party's case.  *Celotex*

*Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  "Once the moving party meets this burden, the

burden shifts to the nonmoving party to demonstrate a genuine issue for trial on a material

matter."  *Concrete Works*, 36 F.3d at 1518 (citing *Celotex*, 477 U.S. at 325).  The nonmoving

party may not rest solely on the allegations in the pleadings, but must instead designate "specific

facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324; *see* Fed. R. Civ. P.

56(e) (2006).  A fact in dispute is "material" if it might affect the outcome of the suit under the

governing law; the dispute is "genuine" if the evidence is such that it might lead a reasonable jury

to return a verdict for the nonmoving party.  *Allen v. Muskogee*, 119 F.3d 837, 839 (10th Cir.

1997) (citing *Anderson*, 477 U.S. at 248).  The court may consider only admissible evidence when

ruling on a summary judgment motion.  *See World of Sleep, Inc. v. La-Z-Boy Chair Co.*, 756 F.2d

1467, 1474 (10th Cir. 1985).  The factual record and reasonable inferences therefrom are viewed

in the light most favorable to the party opposing summary judgment.  *Byers v. City of

Albuquerque*, 150 F.3d 1271, 1274 (10th Cir. 1998) (citing *Concrete Works*, 36 F.3d at 1517).

**2.      Evaluation of Claims**

Section 1981 proscribes "all intentional racial discrimination in the making or enforcement

of private or public contracts.  In particular, [section] 1981 protects employees from racial

discrimination both in entering into an employment contract and in enjoying the benefits,

privileges, terms and conditions of employment."[2] *Exum v. United States Olympic Comm.*, 389

---

[2]The allocation of burdens to prove intentional discrimination under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* (2006) ("Title VII"), applies equally to intentional discrimination claims brought under section 1981.  *Durham v. Xerox Corp.*, 18 F.3d 836, 839 (10th Cir. 1994); *see Baca v. Sklar*, 398 F.3d 1210, 1218 (10th Cir. 2005) (holding in racial discrimination suits, the elements of a plaintiff's claim for disparate treatment are the same whether brought under section1981 or Title VII); *Roberts v. Roadway Express*, 149 F.3d 1098, 1103 n.1 (10th Cir. 1998) (holding that the elements of a retaliation claim under section 1981 are "identical" to those required under Title VII).  Accordingly, where appropriate, I draw on existing legal authority under Title VII to guide my analysis of Plaintiff's section 1981 claims.

F.3d 1130, 1134 (10th Cir. 2004) (citations omitted).  I address each of Plaintiff's claims under section 1981 in turn.

### a.    Hostile Work Environment Based on Racial Harassment

Defendant moves for summary judgment on Plaintiff's hostile work environment claim. (Def.'s Br. at 24–38.)  Plaintiff alleges that Defendant violated section 1981 by subjecting him to a hostile work environment when Defendant's employees harassed him by, *inter alia*, creating a noose and chalk drawing and making various racially discriminatory comments.  (Pl.'s Resp. at 29–47.)  To survive summary judgment, Plaintiff must show that "under the totality of the circumstances: (1) the harassment was pervasive or severe enough to alter the terms, conditions, or privilege of employment, and (2) the harassment was racial or stemmed from racial animus." *Bolden v. PRC Inc.*, 43 F.3d 545, 551 (10th Cir. 1994).  Any harassment that would not have occurred but for Plaintiff's race may, if sufficiently patterned or pervasive, comprise an illegal condition of employment.  *Turner v. Barr*, 811 F. Supp. 1, 2 (D.D.C. 1993) (holding harassment need not have clearly racial overtones, and "'any harassment or other unequal treatment of an employee' caused by the race . . . of the employee may create a violation of Title VII.") (quoting *McKinney v. Dole*, 765 F.2d 1129, 1138–39 [D.C. Cir. 1985]); *see also Hicks v. Gates Rubber Co.*, 833 F.2d 1406, 1415 (10th Cir. 1987).

To establish a hostile work environment, the harassment, in whatever form it may take, must be pervasive or severe.  *Bolden*, 43 F.3d at 551.  "[A] few isolated incidents of racial enmity" or "sporadic racial slurs" cannot establish pervasive harassment.  *Witt v. Roadway*

*Express*, 136 F.3d 1424, 1432–33 (10th Cir. 1998).  Rather, Plaintiff must establish "a steady

barrage of opprobrious racial comments." *Chavez v. New Mexico*, 397 F.3d 826, 832 (10th Cir.

2005) (citations omitted).  Similarly, "the mere utterance of a statement which engenders

offensive feelings in an employee" is insufficient to establish severe harassment.  *Witt*, 136 F.3d at

1432–33.  Defendant argues that Plaintiff cannot maintain his claim because he cannot establish

that a hostile work environment existed, or if he can, he cannot establish Defendant's liability.

(Def.'s Br. at 24–38.)

### i.      *Existence of a Hostile Work Environment*

Plaintiff argues that Defendant's hostile working environment consisted of: (1)  racially

discriminatory statements made by Ramirez, Blumenshine, Wall, Gibrael, Carter, Jimenez,

Brezeale, Heaton, and Pond; (2) racially discriminatory statements made in the presence of

Wilkins and Pearce; and (3) the noose and chalk outline.  (Pl.'s Resp. at 29–35, 38.)  Plaintiff

provides no citation to the record in support of his first two contentions.  (*Id.* at 38.)  Conclusory

allegations, without more, are insufficient to create a genuine issue of fact for summary judgment.

*Annett v. Univ. of Kan.*, 371 F.3d 1233, 1237 (10th Cir. 2004).  In his statement of additional

disputed facts, Plaintiff makes assertions regarding comments by several of the employees in

question.[3]  Specifically, Plaintiff outlines comments made by Ramirez, Blumenshine, Gibrael,

---

[3]Because Plaintiff has properly cited the record in his statement of additional disputed
facts and has clearly delineated in subsections the statements by each of the individuals in
question, I reluctantly cite thereto.  I underscore that pursuant to my local rules, the "sole
purpose" of the required statements of undisputed and disputed material facts is "to establish facts
and determine which of them are in dispute.  *Legal* argument . . . should be reserved for separate
portions of the brief."  (Practice Standards — Civil, Special Instructions Concerning Motions for

-18-

Carter, and Jimenez. (Pl.'s Resp., Statement of Additional Disputed Facts ¶¶ 11–37.) Plaintiff

offers neither argument nor clearly delineated factual allegation as to verbal statements made by

Wall, Brezeale, Heaton, and Pond. (*Id.*, *passim*.) Accordingly, I do not address these individuals.

I address Plaintiff's substantiated assertions as to each individual's statements in turn.

Plaintiff asserts that Ramirez used the epithet "nigger" on three occasions. (*Id.*, Statement

of Additional Undisputed Facts ¶¶ 12, 14, 15.) Plaintiff asserts that sometime in 2001, Ramirez

recounted a story to Plaintiff about a woman being considered for jury selection who commented

"if it's a nigger, he already [sic] guilty." (*Id.*, Statement of Additional Disputed Facts ¶ 15, Ex. 2

at 129–30 [Murphy Dep.].) Plaintiff does not argue or evince that Ramirez would not have made

this statement but for Plaintiff's race. To be probative of discriminatory racial harassment, a

statement must be based on the plaintiff's race or be an expression of the speaker's racial animus.

*See Bolden*, 43 F.3d at 551. It is difficult to ascertain how the recollection of another person's

statement not directed at or involving Plaintiff, without more, could demonstrate the speaker's

racial animus. As such, this statement cannot serve to establish racial harassment.

Plaintiff makes two further assertions regarding Ramirez's racial harassment: (1) in July

2001, Ramirez commented that "niggers" used to chase him in California; and (2) in Winter 2001,

after a former co-worker "blew up" Ramirez's truck, Ramirez commented that his African-

---

Summary Judgment ¶ 7.) I remind Plaintiff that, although equity abhors a forfeiture, this court is
not tasked with linking parties' alleged facts and arguments. I admonish Plaintiff to follow my
rules more closely in the future.

American acquaintance would avenge him and stated "[w]here that nigger at [sic]?"  (Pl.'s Resp.,

Ex. 2 at 86–86 [Murphy Dep.]; *see also* Def.'s Br., Statement of Undisputed Material Facts ¶ 96,

Ex. 2 at 95 [Murphy Dep.]; *admitted at* Pl.'s Resp., Resp. to Def.'s Statement of Undisputed

Material Facts ¶ 96.)  Notably, Ramirez did not use the epithet to refer to Plaintiff in either

instance.  Moreover, Plaintiff does not allege or otherwise evince that Ramirez would not have

made either statement but for Plaintiff's race.  "[M]ere utterance of a statement which engenders

offensive feelings in an employee" cannot demonstrate harassment.  *See Witt*, 136 F.3d

at1432–33.  Although Ramirez's statements may have been offensive to Plaintiff, they are

ultimately insufficient to establish harassment.

Plaintiff asserts that Blumenshine commented the Grand Tetons were "God's country" due

to the lack of African-Americans and Mexican-Americans.  (Pl.'s Resp., Statement of Additional

Undisputed Facts ¶ 17.)  Plaintiff further asserts that Blumenshine "said other racist things,"

which he cannot recall and of which he provides no evidence.  (*Id.*, Ex. 2 ¶ 14 [Murphy Aff.].)

Conclusory allegations are insufficient to create a genuine issue of fact for summary judgment.

*Annett*, 371 F.3d at 1237.  Consequently, I only address the statement for which Plaintiff offers

substantiation.  Blumenshine's statement does not involve Plaintiff, and Plaintiff does not attempt

to argue that Blumenshine would not have made the comment but for Plaintiff's race.

Accordingly, the statement is another example of a merely offensive utterance, insufficient to

demonstrate racial harassment.  *Witt*, 136 F.3d at1432–33.

Plaintiff asserts that Gibrael contributed to Defendant's hostile work environment by using the term "nigger-rig" and the epithets "sand-nigger" and "wetback " (Pl.'s Resp., Statement of Additional Disputed Facts ¶ 21.)  In April 2002, Gibreal entered the break room — where several employees were present, including Plaintiff and Wall — and announced that he had to "nigger-rig" a piece of equipment.  (*Id.*, Ex. 7 at 12 [Gibrael Dep.].)  Plaintiff immediately reported Gibrael's statement to Giorno.  (*Id.*, Ex. 2 at 103 [Murphy Dep.].)  Directly after hearing Plaintiff's concerns, Giorno spoke to Gibrael and urged him to apologize to Plaintiff.  (Def.'s Br., Ex. 5 at 41–42 [Giorno Dep.].)  Gibrael complied with Giorno's request and apologized to Plaitniff.  (Pl.'s Resp., Ex. 2 at 133 [Murphy Dep.].)  Plaintiff asserts that during his apology, Gibrael stated that he (Gibrael) had been called "sand-nigger," which offended Plaintiff.  (*Id.*,  Ex. 2 at 133–34 [Murphy Dep.], Ex. 7 at 22–23 [Gibrael Dep.].)  Plaintiff asserts further that he heard Gibrael use the term "wetback" between seven and ten times to refer to a certain Mexican-American employee of Defendant.  (Def.'s Br., Ex. 2 at 117–18.)  It is difficult to ascertain how Gibrael's: (1) usage of an epithet not directed at or involving Plaitiff; (2) recollection of an epithet that has been used against Gibrael himself; or (3) usage of an epithet against a person of a different racial background than Plaintiff, without more, could serve to establish Gibrael's racial animus against Plaintiff.  Indeed, Plaintiff offers no argument as guide.  Gibrael's statements amount to offensive utterances insufficient to establish harassment.  *Witt*, 136 F.3d at1432–33.

Plaintiff asserts that Carter refused to talk to Plaintiff, commented that Carter's father referred to his employees as "his niggers," and indicated that police can pull Caucasians over with

impunity but will be accused of "profiling" if they pull African-Americans over.  (Pl.'s Resp.,

Statement of Additional Disputed Facts ¶¶ 29, 31.)  Plaintiff's assertions do not amount to

evidence of racial harassment.  Plaintiff testified that Carter was quiet, had an unpleasant attitude

in general, and had affronted other co-workers, including Blumenshine.  (*Id.*, Ex. 2 at 142–46

[Murphy Dep.].)  Accordingly, Plaintiff cannot establish that Carter's refusal to speak to him was

based on Plaintiff's race.  Further, it is difficult to see how Carter's recollection of an epithet his

father used, without more, could be an expression of Carter's own racial animus.  (*Id.*, Ex. 4 at

19–22 [Carter Dep.].)  Indeed, Plaintiff's evidence shows that Carter's recollection neither

involved Plaintiff nor directed the epithet toward Plaintiff.  (*Id.*)  As such, Carter's recollection is

an offensive utterance that is insufficient to demonstrate racial harassment.  *See Witt*, 136 F.3d

at1432–33.  Finally, Carter's complaint regarding racial profiling lacks racial epithets, threats, and

other typical hallmarks of racial hatred.  (Pl.'s Resp., Ex. 2 at 215–16 [Murphy Dep.].)

Moreover, Plaintiff does not attempt to argue or evince that Carter would not have made the

statement but for Plaintiff's race.  Accordingly, Carter's profiling complaint does not rise to the

level of racial harassment.  *See Bolden*, 43 F.3d at 551.

Plaintiff asserts that Jimenez asked him whether Plaintiff, as an African-American, would

be hanged in Arkansas for "fooling with" Caucasian women.  (Pl.'s Resp., Ex. 2 at 217–20

[Murphy Dep.].)  Plaintiff testified that he did not find the comment offensive at the time Jimenez

made it.  (*Id.*, Ex. 2 at 220 [Murphy Dep.].)  A plaintiff must subjectively believe that the alleged

harasser's conduct was sufficiently severe to create an abusive or hostile environment.  *Witt*, 136

F.3d at 1432–33 (citing *Smith v. Norwest Fin. Acceptance, Inc.*, 129 F.3d 1408, 1413 [10th Cir.

1997]).  "[I]f the victim does not subjectively perceive the environment to be abusive, the conduct

has not actually altered the conditions of the victim's employment."  *Id.* (citation and internal

quotation marks omitted.)  Since Jimenez did not offend Plaintiff, Plaintiff cannot rely on

Jimenez's statement to establish racial harassment.

Plaintiff asserts that the creation of a noose and chalk outline of a body by Breazeale,

Heaton, Pond, and Wall was racial harassment that fostered a hostile work environment.  (Pl.'s

Resp., at 30–35.)  Defendant underscores Plaintiff's lack of evidence that the noose was directed

at him and offers the explanation that the employees created the noose display in protest to poor

quarterly returns in Defendant's retirement plan.  (Def.'s Br. at 27–28.)  The parties do not

dispute that the noose and drawing were not in Plaintiff's primary work area.  (*Id.*, Statement of

Undisputed Material Facts ¶¶ 2, 7, Ex. 1 ¶¶ 4–7, 9 [Feiner Aff.]; *admitted at* Pl.'s Resp., Resp. to

Def.'s Statement of Undisputed Material Facts ¶¶ 2, 7.)  Other than the noose and outline,

Plaintiff does not allege or provide evidence that Breazeale, Heaton, Pond, or Wall made racially

offensive statements or otherwise expressed racial animus.  (Pl.'s Resp., *passim*.)  Perhaps most

importantly, Plaintiff admits Defendant's statement that the noose had a sign on it reading

"[Defendant] retirement plan."  (Def.'s Br., Statement of Undisputed Material Facts ¶ 44;

*admitted at* Pl.'s Resp., Resp. to Def.'s Statement of Undisputed Material Facts ¶ 44.)  The

general notion that a noose can be a symbol of racial hatred and Plaintiff's subjective belief that

the offending individuals' explanation is implausible serve as Plaintiff's only evidence that the

noose and outline were acts of racial harassment. (Pl.'s Resp. at 29–35.) That Plaintiff subjectively found the noose offensive cannot raise a question of fact as to whether the noose was objectively racial harassment arising out of a racial animus. Similarly, Plaintiff's subjective disbelief of the individuals' evidenced rationale for the noose cannot substitute for rebuttal evidence to show racial animus as motivation. In the instant case, the noose is a mere offensive utterance, which cannot serve to establish a hostile work environment. *See Witt*, 136 F.3d at 1432–33. On the whole, Plaintiff has presented a series of isolated events and offensive utterances that cannot raise an issue of fact as to the existence of a hostile work environment. Poignantly, even if Plaintiff had created an issue of fact as to the existence of a hostile work environment, Plaintiff's claim would still fail, because he cannot establish Defendant's liability as employer.

### ii. *Employer Liability*

An employer may be held either directly or vicariously liable for a hostile work environment created by its employes. *Burlington Indus. v. Ellerth*, 524 U.S. 742, 757–65 (1998); *Bolden*, 43 F.3d at 552. An employer may be held directly liable if the employer's negligence allows the actionable hostile work environment to exist or persist. *Bolden*, 43 F.3d at 552. Negligence is the only basis upon which an employer may be held liable where the alleged harasser is the plaintiff's co-worker. *Lockard v. Pizza Hut, Inc.*, 162 F.3d 1062, 1074 (10th Cir. 1998). Alternatively, an employer may be vicariously liable where the alleged harasser is a supervisory employee, subject to the affirmative defense "'that the employer exercised reasonable care to

prevent and correct promptly any . . . harassing behavior."[4]  *Ellerth*, 524 U.S. at 765; *see also*

*Faragher v. City of Boca Raton*, 524 U.S. 775, 807 (U.S. 1998).  Here, Plaintiff appears to

pursue both direct and vicarious liability theories, accordingly, I discuss both.

### *(1)     Vicarious Liability*

Plaintiff argues that Defendant is vicariously liable for any acts or statements made by or in

the presence of Ramirez, Wall, Blumenshine, Wilkins, and Pearce, because those individuals

qualify as supervisory employees of Defendant.  (Pl.'s Resp. 38.)  Defendant argues that Giorno

was Plaintiff's supervisor and the five "lead employees" in question were Plaintiff's co-workers,

and not supervisors for the purposes of establishing liability.  (Def.'s Br. at 30–33.)  It thus falls

upon this court to distinguish "employees who are supervisors merely as a function of

nomenclature from those who are entrusted with actual supervisory powers."  *Parkins v. Civil*

*Constructors of Ill., Inc.*, 163 F.3d 1027, 1034 (7th Cir. 1998).

The Supreme Court has held that a supervisor is an employee who "has been empowered

by the company as a distinct class of agent to make economic decisions affecting other employees

under his or her control."  *Ellerth*, 524 U.S. at 762.  To be considered a supervisor, an employee

must have:

---

[4]I have simplified my description of the affirmative defense requirements somewhat in light of the facts in the instant case.  The defense described is only available to an employer that has not taken a tangible employment action.  *Ellerth*, 524 U.S. 764–65.  A tangible employment decision is a decision that: (1) usually causes economic harm, (2) is usually an official company act, (3) is usually documented in official company records, and (4) may be subject to review by higher level supervisors.  *Id.* at 762.  Here, Plaintiff does not allege — and the evidence on record does not support — that Defendant took a tangible employment action.  (Pl.'s Resp., *passim.*)

the authority to affect the terms and conditions of the victim's employment. This authority primarily consists of the power to hire, fire, demote, promote, transfer, or discipline an employee. Absent an entrustment of at least some of this authority, an employee does not qualify as a supervisor for purposes imputing liability to the employer.

*Parkins*, 163 F.3d at 1034.[5]  Plaintiff argues that the above-named individuals are supervisors because they: (1) are part of Defendant's "management structure;" (2) possessed authority to answer employees' questions about human resources issues; (3) controlled the day-to-day activities of their reporting employees; (4) are referred to as "supervisors" on performance review forms and in interview notes; and (5) helped determine pay scales.  (Pl.'s Resp. at 41–43.) Despite Plaintiff's argument, Plaintiff admits that lead employees "do not have the authority to hire, fire, promote, demote, transfer[,] or discipline any [Defendant] employee;" and such employment actions required the approval of a salaried member of Defendant's management. (Def.'s Br., Statement of Undisputed Material Facts ¶ 4, Ex. 1 ¶ 10 [Feiner Aff.]; *admitted at* Pl.'s Resp., Resp. to Def.'s Statement of Undisputed Material Facts ¶ 4.)  Further, Plaintiff admits that Ramirez, Blumenshine, Pearce, and Wilkins were "kiln leads."  (*Id.*, Statement of Undisputed Material Facts ¶ 9, Ex. 1 ¶ 12 [Feiner Aff.]; *admitted at* Pl.'s Resp., Resp. to Def.'s Statement of Undisputed Material Facts ¶ 9.)  Thus, by Plaintiff's own admission, none of the four individuals named above is a supervisor for the purposes of Defendant's liability.  *Parkins*, 163 F.3d at 1034.

---

[5]In the apparent absence of binding or apposite precedent in the Tenth Circuit regarding the determination and definition of a "supervisor" for the purposes of establishing liability, I look to other circuits for guidance.  I underscore the Tenth Circuit Court's reliance upon *Parkins v. Civil Constructors of Ill., Inc.*, 163 F.3d 1027 (7th Cir. 1998), in an unpublished decision involving jury instructions on supervisory status in a Title VII case.  *See Smith v. City of Okla. City*, 64 Fed. Appx. 122, 126 (10th Cir. 2003).

As to Wall, Plaintiff's only support for Wall's alleged supervisory authority consists of Plaintiff's averments that Wall was not his direct supervisor, but "had authority to go to another supervisor and get [Plaintiff] fired." (Pl.'s Resp., Ex. 1 ¶ 7 [Murphy Aff.].) Furthermore, both Feiner and Wall averred that Wall worked for Defendant as a lead employee in the maintenance department subject to the limited authority described above. (Def.'s Br., Ex. 1 ¶ 13 [Feiner Aff.], Ex. 23 ¶¶ 2–5 [Wall Aff.].) Plaintiff neither alleges that Wall had authority to make any economic decisions regarding Plaintiff's employment nor rebuts Defendant's evidence to the contrary. Accordingly, Plaintiff has not raised a genuine issue of fact as to Wall's status as a supervisor for the purposes of Defendant's liability as his employer. *See Parkins*, 163 F.3d at 1034. Because Ramirez, Wall, Blumenshine, Wilkins, and Pearce are not supervisors, as a matter of law, Defendant cannot be vicariously liable for their actions. *See Ellerth*, 524 U.S. at 757–65; *Bolden*, 43 F.3d at 552.

### *(2)    Negligence*

Although Plaintiff focuses the substance of his argument on vicarious liability, Plaintiff also states "[a]n employer is liable for co-worker harassment if it knew or reasonably should have known about [] harassment but did not take adequate steps to stop it." (Pl.'s Resp. at 40.) In order to prevail on a negligence theory for Defendant's liability, Plaintiff bears the burden of establishing that Defendant knew or should have known about the racially harassing conduct and failed to stop it. *Hollins v. Delta Airlines*, 238 F.3d 1255, 1258 (10th Cir. 2001). The focus of this court's inquiry is "whether the employer itself is responsible for failing to intervene." *Id.* Because an employer is only potentially liable for negligence in remedying and preventing

harassment that it knew or should have known about, courts make a two-fold inquiry into:  (1)

the employer's actual or constructive knowledge of the harassment; and (2) the adequacy of the

employer's remedial and preventative responses to any actually or constructively known

harassment.  *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 673 (10th Cir. 1998).

Plaintiff argues that Defendant has constructive knowledge of any statements made by

Ramirez, Wall, and Blumenshine and any statements made in the presence of Wilkins and Pearce,

because those individuals qualify as supervisory employees of Defendant.  (Pl.'s Resp. 38.)  As

established and discussed above, these five individuals are not supervisors as a matter of law.

Thus their knowledge cannot be imputed to Defendant and Defendant is not vicariously liable for

their actions.  *Bolden*, 43 F.3d at 552.  Accordingly, I turn to the facts to determine Defendant's

knowledge.  Plaintiff admits that he did not speak to Defendant's supervisory employees

regarding Ramirez's comments, two of Gibrael's comments, or Jimenez's comment.  (Pl.'s Resp.,

Ex. 2 at 120, 127–28, 134, 221 [Murphy Dep.].)  Plaintiff does not evince that he spoke to

Defendant's supervisory employees regarding Blumenshine's comments or Carter's comments.[6]

(*Id.*, Ex. 2 at 215–16 [Murphy Dep.].)  The parties do not dispute that Plaintiff: (1) spoke to

_____

[6]Plaintiff asserts he reported Blumenshine's statement to Giorno.  (Pl.'s Resp., Statement of Additional Disputed Facts ¶ 18; *disputed at* Def.'s Reply, Resp. Concerning Statement of Additional Disputed Facts ¶ 18.)  Purportedly in support of his assertion, Plaintiff relies on a section of his testimony, wherein Plaintiff testified, when asked whether he had complained to anyone else besides Blumenshine about Blumenshine's comment, "Nope. . . . I do recall saying something to [Giorno] about something that had happened with me and [Blumenshine] . . . . But I can't remember exactly what it was. . . . [I]t may have been more job-related than a racist thing."  (Pl.'s Resp., Ex. 2 at 127–28 [Murphy Dep.].)  Additionally, Plaintiff's assertion ignores his testimony that he complained "[o]nly to Blumenshine" about the comment.  (Def.'s Br., Ex 2 at 94 [Murphy Dep.].)

-28-

Giorno about Gibrael's "nigger-rig" comment; and (2) reported the noose and chalk outline to Pearce, who in turn reported to Giorno. (*Id.*, Ex. 2 at 103 [Murphy Dep.], Ex.6 at 49 [Giorno Dep.].) Thus, Plaintiff has established that he put Defendant on notice of two discriminatory events, which may serve as the basis for Defendant's liability. I turn to Defendant's responses.

It is undisputed that Defendant's response to Plaintiff's complaint about Gibrael's comment went as follows: (1) Giorno promptly talked to Gibrael about Plaintiff's complaint and urged him to apologize to Plaintiff; (2) Giorno reported Gibrael's comment to Feiner and Moulton, Gibrael's supervisor; and (3) Moulton gave Gibrael a verbal warning — which Feiner witnessed — prohibiting the use of "any kind of [r]acial [s]lurs in or around the plant site," and indicating that "any further incidents will result in further disciplinary action."[7] (Def.'s Br., Statement of Undisputed Material Facts ¶¶ 30, 36–37, Ex. 5 at 41–43 [Giorno Dep.], Ex. 6 at 174 [Feiner Dep.], Ex. 20 [Letter of Special Contact]; *admitted at* Pl.'s Resp., Resp. to Def.'s Statement of Undisputed Material Facts ¶¶ 30, 36–37.) The Tenth Circuit has found an employer's response adequate as a matter of law where the employer conducted an investigation, counseled the harasser regarding the inappropriate behavior, and warned that future harassment

---

[7]Despite his admissions, Plaintiff asserts that Giorno "failed to further [sic] investigate [Plaintiff's] complaint or remedy [] Gibrael's harassment" beyond urging the apology. (Pl.'s Resp., Statement of Additional Disputed Facts ¶ 25.) Plaintiff purports to support this assertion with Feiner's testimony that he had never fired anyone for racial harassment and Giorno's testimony that Defendant had a zero-tolerance policy with respect to harassment. (Pl.'s Resp., Ex. 3 at 52 [Feiner Dep.], Ex. 8 at 40 [Giorno Dep.].) Plaintiff appears to suggest that Defendant's zero-tolerance policy mandates termination upon utterance of a racist epithet. Plaintiff provides this court no evidence to establish this specific contention, or the existence of any such policy.

would not be tolerated.  *Scarberry v. ExxonMobil Oil Corp.*, 328 F.3d 1255, 1259 (10th Cir. 2003); *see Adler*, 144 F.3d at 677–78 (holding reasonable response for harassment may include prompt investigation, warning to refrain from harassing conduct, and warning that future misconduct may result in discipline).  Accordingly, Defendant's response to Gibrael's comment was adequate as a matter of law.

Defendant's response to Plaintiff's complaint about the noose was similarly prompt and adequate.  The parties do not dispute that on September 30, 2002, Giorno and Feiner learned of the incident and began an investigation the same day, holding meetings with employees including, *inter alia*, Heaton and Plaintiff.  (Def.'s Br., Statement of Undisputed Material Facts ¶¶ 62, 65; *admitted at* Pl.'s Resp., Resp. to Def.'s Statement of Undisputed Material Facts ¶¶ 62, 65.) Further, Plaintiff does not admit, deny, or present allegation or evidence to rebut Defendant's assertions that on October 2, 2002, Feiner met with the maintenance department employees, asked them whether the noose was meant as a racist statement, and told them their behavior was not acceptable and would be punished if repeated.  (*Id.*, Statement of Undisputed Material Facts ¶¶ 67–70, Ex. 6 at 159–61 [Feiner Dep.], Ex. 25 at 71 [Wilkins Dep.].)  On the facts as presented, Defendant investigated the incident, counseled the actors regarding the inappropriate behavior, and warned that repetitions of such behavior would not be tolerated.  Plaintiff has not raised a genuine issue of fact to suggest otherwise.  Thus, Defendant's response to Plaintiff's complaint about the noose was adequate as a matter of law.  *See Scarberry*, 328 F.3d at 1259.

Plaintiff argues that Defendant's policies did not prevent harassment, tarnishing

Defendant's responses to his complaints.  (Pl.'s Resp. at 45.)  Plaintiff alleges that Defendant's

"open door" policy all but prohibited employees' reporting harassment by a supervisor by

requiring that all employee complaints go through their supervisors, even if the supervisor is the

subject of the complaint.  (*Id.*)  Plaintiff argues that he could only have reported the harassment

by the individuals he incorrectly defines as supervisors — Blumenshine, Ramirez, Gibrael, Wall,

and Pearce — by advising them he intended to report them and seeking their assistance in setting

up a meeting with higher management.  (*Id.*)  Plaintiff relies upon the Supreme Court's findings in

*Faragher*, and argues that because Defendant's policy lacked assurance that an employee could

bypass a harassing supervisor in order to lodge a complaint, as a matter of law, Defendant could

not adequately prevent harassment.  *See Faragher*, 524 U.S. at 808.

Plaintiff's argument fails for myriad reasons.  First, Plaintiff himself did not follow the

procedures that he asserts were imposed upon him.  It is undisputed that Plaintiff complained

directly to Giorno about Gibrael's "nigger-rig" comment.  (Def.'s Br., Statement of Undisputed

Material Facts ¶ 28; *admitted at* Pl.'s Resp., Resp. to Def.'s Statement of Undisputed Material

Facts ¶ 28.)  Further, Plaintiff's argument focuses on Defendant's "open-door" policy, which

appears in Defendant's handbook on the page immediately preceding Defendant's "non-

discrimination" and "harassment" policies.  (Pl.'s Resp., Ex. 13 [Employee Handbook].)

Defendant's anti-harassment policy specifically provides:

> [Defendant] prohibits harassment of its employees, customers[,] or vendors in any
> form.  Such employee conduct may result in disciplinary action up to and including

> dismissal. . . .  Employee(s) experiencing harassing situations have the right to contact their supervisor, their supervisor's supervisor <u>or</u> their personnel representative directly.

(*Id.*) (emphasis in original.)  Additionally, Defendant's "non-discrimination and anti-harassment position," which Plaintiff signed and admits to having received, requests that employees report discrimination and harassment and states:

> [i]f an employee is uncomfortable approaching the offender or has done so without success s/he should report such facts to his/her immediate supervisor.  Employees who are uncomfortable approaching their supervisor for any reason or feel that the matter is not being adequately addressed should bring the matter to the attention of the next level of management, [h]uman [r]esources, or a [c]orporate [o]fficer.[8]

(*Id.*, Ex. 20 [Non-Discrimination and Anti-Harassment Position].)  Finally, Plaintiff testified that when he began work, he knew that if he were discriminated or retaliated against that he could "go to a supervisor or to somebody else in management of the company."  (*Id.*, Ex. 2 at 46 [Murphy Dep.].)  It is clear from the record that Defendant's policy was not in controversion with *Faragher* because it contained adequate assurance that an employee could bypass a harassing supervisor to register a complaint.  *See Faragher*, 524 U.S. at 808.  Plaintiff cannot establish Defendant's liability for a hostile work environment, to the extent one existed.  Consequently, Defendant is entitled to summary judgment on Plaintiff's claim.

> **b.**    ***Constructive Discharge***

---

[8]Despite Plaintiff's contention that he did not understand the document's contents, Plaintiff relies on language from this document to support his claim for breach of the covenant of good faith and fair dealing and notes that "this policy applied to all [Defendant's] employees nationwide . . .and all employees were required to sign a receipt and acknowledgment of the policy in order to ensure that they had received, read[,] and agreed to the policy."  (Pl.'s Resp., Resp. to Def.'s Statement of Undisputed Material Facts ¶ 17; *cf. id.* at 55.)

Defendant moves for summary judgment on Plaintiff's claim for constructive discharge. (Def.'s Br. at 59–64.)  Plaintiff argues that Defendant constructively discharged him from employment.  (Pl.'s Resp. at 47–49.)  "The question on which constructive discharge cases turn is simply whether the employer by its illegal discriminatory acts has made working conditions so difficult that a reasonable person in the employee's position would feel compelled to resign." *Derr v. Gulf Oil Corp.*, 796 F.2d 340, 344 (10th Cir. 1986); *see Mitchell v. Mobil Oil Corp.*, 896 F.2d 463, 467 (10th Cir. 1990) (same).  "Essentially, a plaintiff must show that [he] had 'no other choice but to quit.'"  *Yearous v. Niobrara County Mem. Hosp.*, 128 F.3d 1351, 1356 (10th Cir. 1997) (quoting *Woodward v. City of Worland*, 977 F.2d 1392, 1401 [10th Cir. 1992]).  The conditions of employment must be objectively intolerable; the "plaintiff's subjective views of the situation are irrelevant."  *Id.*  Here, Plaintiff asserts that he could no longer perform his job duties effectively because: (1) On September 29, 2002, after Plaintiff reported the noose to Pearce, Pearce joked that his genitals were larger than Plaintiff's; (2) on October 5, 2002, a group of employees pointed and stared at Plaintiff; (3) on October 6, 2002, Pearce said to Plaintiff, "I should play like I thought that rope was for me too so that I could get paid for nothing;" and (4) on October 6, 2002, upon hearing Pearce's statement, Carter stormed out of the room and refused to talk to Plaintiff later that day.  (Pl.'s Resp. at 47–49.)

Even when viewed in a light most favorable to Plaintiff, Plaintiff's allegations fall woefully short of establishing Defendant's maintenance of working conditions so intolerable that a reasonable person in Plaintiff's position would have felt compelled to quit.  First, a constructive

discharge claim must be based on acts of illegal discrimination. *Derr*, 796 F.2d at 344. Plaintiff offers no evidence to establish that the alleged additional acts of harassment were based on his race. (Pl.'s Resp. at 47–49.) Further, based on the principles outlined *supra*, at *Analysis* §2aii, Plaintiff cannot establish Defendant's liability for the actions he alleges. None of the actors above was a supervisor, and Plaintiff does not allege that he notified Defendant of any of the actions. (*Id.*) Finally, constructive discharge requires a greater degree of harassment than a hostile work environment claim. *DeFlon v. Danka Corp.*, 1 Fed. Appx. 807, 819 (10th Cir. 2001); *see Jackson v. Univ. of Tex. M.D. Anderson Cancer Ctr.*, 172 F. Supp. 2d 860, 869 (D. Tex. 2001) (citing *Brown v. Kinney Shoe Corp.*, 237 F.3d 556, 566 [5th Cir. 2001]). Plaintiff has failed to raise an issue of fact as to Defendant's creation of a hostile work environment, and thus also must fail to raise an issue of fact as to Defendant's creation of a still more harassing environment. Plaintiff has not raised an issue of fact as to whether Defendant maintained a work environment sufficiently difficult as to compel a reasonable person's resignation. Accordingly, Defendant is entitled to summary judgment on Plaintiff's claim for constructive discharge.

c.      *Disparate Treatment*

Defendant argues that it is entitled to summary judgment on Plaintiff's claim for disparate treatment, to the extent he asserts such a claim.  (Def.'s Br. at 38–40).  In a footnote, Plaintiff argues "[t]he facts and law supporting [Plaintiff's] claim of a racially hostile work environment also support his claim of disparate treatment — that is, similarly situated [Caucasian] employees were not subjected to the same treatment as [Plaintiff]."  (Pl.'s Resp. at 28 n.2.)  A plaintiff may demonstrate disparate treatment under section 1981 by either presenting direct evidence of discrimination, or using the burden-shifting framework outlined in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  *See Patterson v. McLean Credit Union*, 491 U.S. 164, 186–87 (1989) (applying *McDonnell Douglas* framework to section 1981 claim); *Salguero v. City of Clovis*, 366 F.3d 1168, 1175 (10th Cir. 2004) (same).  Since Plaintiff provides no direct evidence of discrimination, Plaintiff must rely upon *McDonnell Douglas*.  As a threshold matter under *McDonnell Douglas*, Plaintiff must establish a *prima facie* case of discrimination.  *McCowan v. All Star Maint., Inc.*, 273 F.3d 917, 922 (10th Cir. 2001).  The "burden of establishing a *prima facie* case" is "not onerous."  *Id.*  (citation and internal quotation marks omitted).  "Establishment of a *prima facie* case creates a presumption of unlawful discrimination."  *Tex. Dep't of Cmty Affairs v. Burdine*, 450 U.S. 248, 254–55 (1981).  If Plaintiff establishes a *prima facie* case, the burden of production then shifts to Defendant to "articulate a legitimate, nondiscriminatory reason for the adverse employment action."  *Wells v. Colo. Dept. of Transp.*, 325 F.3d 1205, 1212 (10th Cir. 2003) (citing *McDonnell Douglas*, 411 U.S. at 792).  If Defendant articulates a proper basis

for its actions, the burden shifts back to Plaintiff to demonstrate that the reason advanced by

Defendant is a pretext for discrimination.  *Burdine*, 450 U.S. at 255–56.   Defendant argues that

Plaintiff cannot maintain his claim because he cannot establish a *prima facie* case for disparate

treatment.  (Def.'s Br. at 39.)

  To establish a *prima facie* case for disparate treatment, Plaintiff must demonstrate that:

(1) he is a member of a protected class; (2) he suffered an adverse employment action; and (3)

similarly situated employees were treated differently.  *Trujillo v. Univ. of Colo. Health Scis. Ctr.*,

157 F.3d 1211, 1215 (10th Cir. 1998).  Plaintiff satisfies the first element, because as an African-

American, he is a member of a protected class.  As to the second element, an adverse employment

action occurs when there is "'a significant change in employment status, such as hiring, firing,

failing to promote, reassignment with significantly different responsibilities, or a decision causing

a significant change in benefits.'"  *Annett*, 371 F.3d at 1237 (quoting *Ellerth*, 524 U.S. at 761).

Additionally, "acts that carry 'a significant risk of humiliation, damage to reputation, and a

concomitant harm to future employment prospects'" constitute adverse employment actions.  *Id.*

at 1239 (quoting *Berry v. Stevinson Chevrolet*, 74 F.3d 980, 986 [10th Cir. 1996]).

  Here, Plaintiff gives the court no guidance as to what the adverse employment action may

be other than the actions that he alleges to support his claim for a hostile work environment.

(Pl.'s Resp. at 38 n.2.)  Plaintiff's allegations regarding constructive discharge are tangled in with

Plaintiff's allegations that racially discriminatory comments and the noose incident led to a hostile

work environment.  (*Id.* at 47–49.)  Indeed, Plaintiff styles the subsection of his brief containing

the argument "[Defendant] Took An Adverse Employment [sic] Against [Plaintiff] By

Constructively Discharging Him From His Employment at [Defendant]."[9]  (*Id.* at 47.)

"'Constructive discharge, like actual discharge, is a materially adverse employment action.'"

*Rennard v. Woodworker's Supply, Inc.*, 101 Fed. Appx. 296, 308–09 (10th Cir. 2004) (quoting

*EEOC v. Univ. of Chicago Hosps.*, 276 F.3d 326, 331 [7th Cir. 2002]).  As discussed *supra* at

*Analysis* § 2b, Plaintiff has not sufficiently established his constructive discharge.  Consequently,

Plaintiff cannot satisfy the second element to establish a *prima facie* case for disparate treatment.

Defendant is therefore entitled to summary judgment on Plaintiff's claim for disparate treatment.

### d.    Retaliation

Defendant moves for summary judgment on Plaintiff's claim for retaliation in violation of

section 1981.  (Def.'s Br. at 40–43.)  Courts have interpreted section 1981 to provide for

retaliation lawsuits.  *O'Neal v. Ferguson Constr. Co.*, 237 F.3d 1248, 1258 (10th Cir. 2001).  The

*McDonnell Douglas* framework described above applies to section 1981 retaliation claims.

*O'Neal*, 237 F.3d at 1252; *Roberts v. Roadway Express*, 149 F.3d 1098, 1103 (10th Cir. 1998).

Plaintiff alleges that Defendant retaliated against him for objecting to Defendant's racially hostile

work environment in that, upon Plaintiff's return to work after the noose investigation, Plaintiff's:

(1) unidentified "supervisor" treated him with open hostility; (2) unspecified "team members"

---

[9]This is Plaintiff's only express reference to adverse employment action in the section of
his brief devoted to hostile work environment.  (Pl.'s Resp. at 47–49.)  Accordingly, despite the
fact that the remedial nature of section 1981 requires courts to "employ[] a liberal definition of
adverse employment action and [apply] a case-by-case approach," I decline to address the novel
theory that racial epithets, a noose, or a chalk outline could be considered adverse employment
actions.  *Abuan v. Level 3 Communications, Inc.*, 353 F.3d 1158, 1174 (10th Cir. 2003).

refused to talk to him and "stormed past him, hostilely bumping [Plaintiff's] shoulder;" and (3)

unidentified co-workers "pointed and started at him."[10]  (Pl.'s Resp. at 49–50.)  Defendant

contends that Plaintiff cannot establish the requisite *prima facie* case to maintain his claim.

(Def.'s Br. at 40–41; Def.'s Reply at 84–85.)

        In order to establish a *prima facie* case for retaliation, Plaintiff must demonstrate that: (1)

he engaged in protected opposition to discrimination; (2) he was subject to adverse employment

action; and (3) a causal connection exists between the protected activity and the adverse action.

*Roberts*, 149 F.3d at 1103.  Plaintiff's deeply flawed claim must fail.  First, in his argument,

Plaintiff neither identifies the individuals who allegedly retaliated against him nor makes citation to

the record.  (Pl.'s Resp. at 49–50.)  Conclusory allegations, without more, are insufficient to raise

an issue of fact as to summary judgment.  *Annett*, 371 F.3d at 1237.  Moreover, Plaintiff has not

pled an actionable adverse employment action.  Without explanation or argument from Plaintiff, it

is markedly difficult to ascertain how generalized hostility and "point[ing] and start[ing]" could

affect a significant change in Plaintiff's employment status or harm his future employment aspects.

*See id*.  Plaintiff has not raised an issue of fact to establish a *prima facie* case for retaliation.

Thus, Defendant is entitled to summary judgement on Plaintiff's claim.

        e.      ***Intentional Infliction of Emotional Distress/Outrageous Conduct***

        Defendant moves for summary judgment on Plaintiff's claim for intentional infliction of

emotional distress/outrageous conduct.  (Def.'s Br. at 43–45.)  "Proof of the tort of outrageous

---

        [10]This is the first and only allegation of "starting" Plaintiff makes in his submissions.
Plaintiff does not define or explain the term.

conduct must consist of either an extreme act, both in character and degree, or a pattern of

conduct from which the ineluctable conclusion is the infliction of severe mental suffering was

calculated or recklessly and callously inflicted." *Gard v. Teletronics Pacing Sys., Inc.*, 859 F.

Supp. 1349, 1354 (D. Colo. 1994); *accord Pearson v. Kancilia*, 70 P.3d 594, 597 (Colo. Ct.

App. 2003).  A claim for outrageous conduct contemplates only acts that are "so outrageous in

character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be

regarded as atrocious, and utterly intolerable in a civilized community." *Rugg v. McCarty*, 476

P.2d 753, 756 (Colo. 1970); *accord Donaldson v. Am. Banco Corp., Inc.*, 945 F. Supp. 1456,

1465 (D. Colo. 1996).  Plaintiff alleges that Defendant engaged in outrageous conduct by

subjecting him to: (1) unspecified "constant derogatory comments, ridicule[,] and harassment,"

(2) the "overt threat" of a noose; and (3) constructive discharge.  (Pl.'s Resp. at 51–53.)

Defendant argues that Plaintiff's claim: (1) is an impermissible repetition of his claims for

discrimination and retaliation; and (2) is barred by the Colorado Workers' Compensation Act,

Colo. Rev. Stat. § 8–4–301 (2005).  (Def.'s Br. at 43–45; Def.'s Reply at 85–89.)

　　　　Plaintiff fails to cite to the record and eschews specificity in his argument, alleging

"[Defendant's] perpetuation of the overtly and pervasively racist environment[], as described

above, provides persuasive evidence of outrageous conduct."  (Pl.'s Resp. at 53.)  Plaintiff cannot

create a genuine issue of fact with such conclusory allegations.  *Annett*, 371 F.3d at 1237.

Moreover, a plaintiff's allegations forming the basis of a claim for outrageous conduct must

exceed those which would state a colorable claim of discrimination.  *See Katz v. City of Aurora*,

85 F. Supp. 2d 1012, 1021 (D. Colo. 2000) ( "[W]here the allegations forming the basis of a

claim for outrageous conduct are the same as those forming the basis for a claim of

discrimination, and nothing more, they fail to state an independently cognizable claim."); *Visor*

*v. Sprint/United Management Co.*, 965 F. Supp. 31, 33 (D. Colo. 1997) (same).  To the extent

Plaintiff's vague allegations can be deciphered, they are identical to those supporting his claims

for disparate treatment and hostile work environment discrimination.  (Pl.'s Resp. at 51–53.)

Accordingly, Plaintiff's claim for outrageous conduct/intentional infliction of emotional distress

fails as a matter of law.  Defendant is thus entitled to summary judgment on Plaintiff's claim.

>     *f.*     ***Breach of the Covenant of Good Faith and Fair Dealing***

Defendant argues it is entitled to summary judgment on Plaintiff's claim for breach of the

covenant of good faith and fair dealing.  (Def.'s Br. at 46–47.)  Plaintiff alleges that Defendant

breached its obligations to him under oral and written representations as part of the employment

relationship between the parties.  (Compl. ¶ 38.)  In his response brief to Defendant's motion,

Plaintiff clarifies his position somewhat, alleging Defendant made representations "both orally and

in writing" that it would treat its employees "in accordance with the principles of fairness, ethical

treatment, dignity, respect, personal integrity, honesty, and good faith," which it breached in its

allegedly unfair and sub-standard investigation of the noose incident and in retaliating against

Plaintiff for "objecting to the overtly racist threat against him."  (Pl.'s Resp. at 54–58.)  Here,

Plaintiff alleges that the written representations appear in Defendant's non-discrimination and

anti-harassment policy, code of ethics, and employee handbook.[11]  (*Id.* at 54–56.)  Purportedly in

support of his argument, Plaintiff cites various excerpts of depositions, in which several of

Defendant's managerial employees testified about their personal expectations and Defendant's

policies regarding treatment of employees.  (*Id.* at 54–58.)  It is markedly difficult to ascertain

how this deposition testimony could provide evidence of verbal promises made to Plaintiff upon

which he relied during his employment.  Accordingly, I analyze only the alleged written

obligations.

The exact nature of Plaintiff's claim remains unclear.  Initially, Plaintiff appears to state a

claim for breach of an express covenant of good faith and fair dealing — which is, in essence, a

breach of contract claim.  (*Id.* at 53–54.)  Plaintiff admits that he did not have an employment

contract with Defendant.  (Def.'s Br., Statement of Undisputed Material Facts ¶ 22; *admitted at*

Pl.'s Resp., Resp. to Def.'s Statement of Undisputed Material Facts ¶ 22.)  Plaintiff confounds the

matter with his assertion that  "a claim for breach of a covenant of good faith and fair dealing may

be claimed either as 'part of an express contract' or 'as the basis of for the application of

promissory estoppel.'"  (Pl.'s Resp. at 54.)  Irrespective of its styling, Plaintiff's claim must fail.

"Whether an alleged promise is claimed to be part of an express contract or is asserted as the basis

for the application of promissory estoppel, it must be sufficiently specific so that the judiciary can

---

[11]Plaintiff's reliance upon statements contained in Defendant's non-discrimination and anti-harassment policy is surprising, because Plaintiff claims not to have understood the document. (Pl.'s Resp., Resp. to Def.'s Statement of Undisputed Material Facts ¶ 17.)  Plaintiff's reliance upon statements in Defendant's code of ethics is still more surprising, given Plaintiff's testimony that he likely did not read the document.  Plaintiff testified "I'm not even going to say that, you know, that I sat and read this."  (Def.'s Reply, Ex. 1 at 38 [Murphy Dep.].)

understand the obligation assumed and enforce the promise according to its terms." *Soderlun v. Public Serv. Co.*, 944 P.2d 616 (Colo. Ct. App. 1997). Plaintiff notes that Defendant's: (1) non-discrimination and anti-harassment policy states that Defendant "expect[s] employees to act in an ethical manner and to treat others with dignity and respect;" (2) code of ethics underscores the importance of "personal integrity," "management candor," and "personal honesty;" and (3) employee handbook promises "[a]ll employees are treated fairly." (Pl.'s Resp. at 54–58, Ex. 13 [Employee Handbook], Ex. 20 [Non-Discrimination and Anti-Harassment Position], Ex. 21 [Code of Ethics].) Promises of fair and ethical treatment, personal integrity, and management candor are not sufficiently specific to express an obligation or commitment Defendant intended to assume. At best, these vague statements amount to general descriptions of Defendant's policies, which are not enforceable under either contract or promissory estoppel theory. *See George v. Ute Water Conservancy District*, 950 P.2d 1195, 1199 (Colo. Ct. App. 1997) (holding that to be enforceable, a promise must be one which the employee could reasonably consider to be a commitment, not a general description of the employer's policies). Consequently, Defendant is entitled to summary judgment on Plaintiff's claim for breach of the covenant of good faith and fair dealing.

### 3.   *Conclusions*

Based on the foregoing it is therefore ORDERED that:

1.      Defendant's motion for summary judgment (# 41) is GRANTED.

2.      The clerk shall forthwith enter judgment in favor of Defendant and against

Plaintiff, dismissing all claims with prejudice.  Defendant may have its costs by filing a bill of

costs within eleven days of the date of this order.


Dated this 29th day of March, 2006.

BY THE COURT:


s/ Edward W. Nottingham
EDWARD W. NOTTINGHAM
United States District Judge